CHEZEM, Judge.
Case Summary
Defendant-Appellant, Leo L. Serougham, appeals from his convictions for Rape (class B felony), Sexual Battery (class D felony), and Confinement (class D felony). We affirm.
Issues
Defendant presents one (1) issue for our review, which we restate as follows:
Whether there was sufficient evidence to support the convictions for Rape, Sexual Battery, and Confinement.
In addition, State raises the question of "whether this case must be remanded for resentencing on the ground that Sexual Battery is a lesser-included offense of Rape."
Facts and Procedural History
At approximately 8:00 a.m. on July 7, 1989, D.T. went to visit her friend Dawn Crockett at the home of Defendant. Crockett was living there with Defendant's son, Harold Serougham. D.T. went to the home that day to check on Dawn's health (she suffered a miscarriage several days earlier). D.T. entered without knocking or ringing the bell because they had told her to do so on prior occasions. With respect to the Defendant, D.T. thought of him "as a see-ond father," and thought she "could trust him." D.T. was sixteen years old at this time.
Upon entering the home, D.T. called out for both Harold and Dawn. When they did not answer, D.T. called out for the Defendant. Defendant emerged from his bedroom, told D.T. that Harold and Dawn were not there, and asked D.T. to come into his bedroom so he could talk to her. D.T. went into the bedroom and sat on the bed, as requested by Defendant. Defendant then asked D.T. if she had ever had sex with anyone in her family, to which D.T. responded "no." While D.T. tried to ignore Defendant, he continued to ask questions about sex. He then stated "I haven't had any for six years since my wife died," and "I wish I had you once."
Defendant next instructed D.T. to reach under the corner of his mattress and retrieve some magazines. When she complied, D.T. discovered that they were "porno books." She immediately put them down and said she would not look at them because she "was brought up in a Christian home." Defendant then told D.T. to "reach down and feel his penis." D.T. refused, got up from the bed, and tried to leave. Defendant grabbed her, forced her back onto the bed, took her clothes off, and then he fondled and raped D.T. At first D.T. "tried getting away," "tried fighting him," and "tried biting him," but eventually she gave up because Defendant was hurting her. She was no match for Defendant, who weighed approximately 800 pounds at the time.
While Defendant was raping D.T., the telephone rang. Before he answered it, Defendant clamped his hand over D.T.'s mouth to keep her from screaming for help. After completing the telephone conversation, Defendant went to the bathroom and got dressed. D.T. grabbed her clothes *544 and went to the kitchen where she called her best friend Danielle Johnson. D.T. told Danielle that she "just got molested by Harold's dad." Harold and Dawn came home several minutes later, and Harold testified that "[it] [took her like ten minutes before she stopped crying where she could talk, she was crying so hard, for her to tell." Defendant had already left the house by this time.
On July 21, 1989, the Marion County Prosecutor's Office filed an Information, which charged Defendant with Rape (class B felony), Sexual Battery (class D felony), and Confinement (class D felony). Defendant was found guilty of these charges at the conclusion of the jury trial on January 31, 1990.
Discussion and Decision
I
Defendant argues that "the State did not present sufficient evidence of probative value to prove [that] he committed the charged crimes." In particular, Defendant argues that "the convictions were based on the victim's testimony which was inherently unbelievable." As stated by Defendant:
[D.T.'s] testimony was disjointed and unbelievable. First it is unbelievable that a sixteen year old girl would sit on the bed of the father of her friend at 8:00 a.m. and discuss sex and not think anything about it. Additionally, it is unbelievable that after the alleged attack [D.T.] did not attempt to leave the house but instead called her friend. Even more incredible is the fact that after reporting the alleged rape to her teacher, [D.T.] returned to the SCROUGHAM home. Her reasoning that she returned because MR. SCROUGHAM was not there is further evidence of the incredible [sic] unbelievable nature of her testimony.
Additionally, it is unrealistic to believe that someone who has been raped would hang around the scene of the rape, call friends on the phone and then after leaving return to the crime scene to see friends.
We initially note that the convictions in this case appear to rest primarily upon the testimony of D.T. Nevertheless, the uncorroborated testimony of the victim is sufficient to sustain a criminal convietion. See, Ellis v. State (1988), Ind., 528 N.E.2d 60, 61; Jones v. State (1983), Ind., 445 N.E.2d 98, 100. In addition, the law is well-established that a court reviewing the sufficiency of the evidence will neither reweigh the evidence nor judge the credibility of witnesses. It is the jury's responsibility to determine whether testimony is contrived, and to generally judge the credibility of witnesses. Accordingly, we "will not in any way impinge on that responsibility unless confronted with 'inherently improba-blie' testimony, or coerced, equivocal, wholly uncorroborated testimony of "incredible dubiosity.'" Bedwell v. State (1985), Ind., 481 N.E.2d 1090, 1092. We consider only the evidence most favorable to the verdict, together with all reasonable inferences to be drawn therefrom, and if there is evidence of probative value to support the verdict, it will not be disturbed. O'Connor v. State (1988), Ind., 529 N.E.2d 331, 332; Clark v. State (1987), Ind.App., 512 N.E.2d 228, 227.
Defendant first claims that "it is unbelievable that a sixteen year old girl would sit on the bed of the father of her friend at 8:00 a.m. and discuss sex and not think anything about it."" With respect to this claim, Defendant has mischaracterized D.T.'s testimony and taken it out of context. He ignores the fact that D.T. was a friend of the family who was given liberal access to the household. In addition, he ignores the fact that D.T. "trusted] him," and thought of him "as a second father." When her testimony here is considered in proper context, it is not "unbelievable." D.T. went over to Defendant's house to check on the health of her friend Dawn. She went into the bedroom only at the request of Defendant, who said he had something to tell D.T. Once in the bedroom, D.T. did not "discuss sex" with Defendant. Instead, Defendant tried to get D.T. to discuss the subject, but she refused. D.T. testified that she felt uncomfortable and tried to ignore Defendant.
Defendant next claims that "it is unbelievable that after the alleged attack [D.T.] did not attempt to leave the house but instead called her friend." Once again, Defendant has failed to provide the proper context of testimony at trial. He ignores *545 the fact that D.T. was not raped by a stranger; she was raped by her "second father." After an attack, one is more likely to flee from a stranger than a friend or relative. In addition, other than the rape itself, D.T. was not physically harmed by Defendant. She also knew the rape was over when Defendant went into the bathroom and got dressed. In other words, D.T. could have reasonably assumed that the danger to her was over for the moment. With respect to the fact that D.T. "called her friend," we note that she did so immediately after the rape. During that conversation, D.T. told her friend that she "just got molested by Harold's dad." Harold and Dawn then came home to find D.T. "crying so hard" it took her ten (10) minutes to stop. The testimony at trial established that Defendant had left the house by this time.
We next address the claim that more incredible is the fact that after reporting the alleged rape to her teacher, [D.T.] returned to .the SCROUGHAM home." This testimony is not incredible or unbelievable. D.T. knew that Defendant would not be there when she returned. In addition, she sought the help of her friend Dawn, who assisted her in getting to St. Francis Hospital Once at the hospital, D.T. called her family and told them about the rape. She initially did not want to involve the police because she had been raped before and knew what she would have to go through.
Lastly, Defendant argues that D.T.'s testimony about the rape is "unbelievable" because "[alt trial the defense offered un-controverted evidence from an unbiased witness which placed MR. SCROUGHAM in his vehicle at the time of the alleged rape." This is a misrepresentation of the record. First, the witness in question was not necessarily "unbiased," as she had been a friend of Defendant's family for approximately twenty-five (25) years. See ond, the witness' testimony did not conclusively establish that Defendant was in his car when the rape allegedly occurred. The witness testified that she called Defendant at approximately 7:55 a.m. and requested that he come over and give one of her tenants a ride so she could obtain food stamps. She testified that the trip to her place would take Defendant between fifteen (15) to thirty (80) minutes, depending on traffic conditions. He arrived there at 8:21 a.m. On the other hand, D.T. testified on cross-examination that she arrived at Defendant's house between 7:40 a.m. and 8:00 a.m. Upon arrival, she immediately went into the bedroom at the request of Defendant. The rape occurred shortly thereafter, and terminated when the telephone rang. Defendant left the house a few minutes later.
Therefore, when we consider the evidence most favorable to the verdict, together with all reasonable inferences to be drawn therefrom, we cannot say that D.T.'s testimony was "unbelievable" or "inherently improbable." We hold the evidence sufficient.
II
We next consider the issue raised by the State-"whether this case must be remanded for re-sentencing on the ground that Sexual Battery is a lesser-included offense of Rape." In essence, was it proper to convict Defendant of both Rape and Sexual Battery, and for the trial court to impose separate sentences thereon? The question raises concerns as to Article 1, § 14 of the Indiana Constitution, as well as the Double Jeopardy Clause of the Fifth Amendment, which together protect against multiple punishments for the same offense.
To determine whether offenses are the same under the Double Jeopardy Clause, the following standard has been established:
The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.
Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). This test or standard was further refined or developed in Brown v. Ohio, 432 *546 U.S. 161, 166, 97 S.Ct. 2221, 2226, 53 L.Ed.2d 187 (1977), as follows:
This test emphasizes the elements of the two crimes. 'If each requires proof of a fact that the other does not, the Block-burger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes ...' [Citation omitted.]
The test set forth in Blockburger and further developed in Brown has been adopted in Indiana. Justice Pivarnik, writing for the Indiana Supreme Court in Elmore v. State (1978), 269 Ind. 532, 382 N.E.2d 893, 897, stated as follows:
The foeus of a proper double jeopardy analysis must be on whether or not the offenses to be prosecuted and punished are the same, and not whether the offenses spring from the same act or operative circumstances. The inquiry into whether the offenses stem from the same act is merely the first step in the analysis. If the offenses are premised upon different acts, the problem is not so great. But where they do arise from the same act, we must proceed to determine whether the offenses charged are themselves the same, for the Double Jeopardy Clause was written in terms of the 'same offense,' not the same act. In other words, the fact that the offenses stem from the same act merely informs us that there is a potential problem; it is not a solution to the problem. The ultimate focus is on the identity of their source.
See also, Riding v. State (1988), Ind.App., 527 N.E.2d 185, 188-189; Whittle v. State (1989), Ind., 542 N.E.2d 981, 992.
The definition and elements of Rape are set forth in 1.0. 85-42-4-1. Under this statute, the State had to prove at trial that Defendant "knowingly or intentionally hald] sexual intercourse with [D.T.]," and that D.T. was "compelled by force or imminent threat of force" to submit to the Rape. With respect to Sexual Battery, the pertinent statute is .C. 85-42-4-8. There, the State had to prove that Defendant, "with [the] intent to arouse or satisfy [his] own sexual desires or the sexual desires of [D.T.], touche[d] [D.T.] when {[she was] compelled to submit to the touching by force or the imminent threat of force."
Even a cursory review of the pertinent statutes reveals that each crime contains an element which the other does not. Rape requires sexual intercourse or penetration, which is not required for Sexual Battery. Of course, there is sufficient evidence of penetration in this case. D.T. testified at trial that Defendant stuck his penis "[i)n my vagina."
On the other hand, Sexual Battery requires a touching with the intent to arouse or satisfy one's own sexual desires or those of his victim, which is not required for Rape. D.T. testified that in addition to the penetration, Defendant also touched her by "playing with my breasts." Defendant also stated at one point that "this feels good."
In addition, we must look to the manner in which the offenses are charged in applying the Blockburger test. See, Tawney v. State (1982), Ind., 439 N.E.2d 582, 588. Count I alleged that Defendant "did knowingly or intentionally have sexual intercourse with [D.T.] ... when [she] was compelled by force or imminent threat of force." Count II alleged that Defendant "did, with intent to arouse or satisfy his own sexual desires, touch [D.T.] when [she] was compelled by force or the imminent threat of force to submit to the touching." Therefore, the charges in question closely parallel the language of the pertinent statutes, and each requires proof which the other does not.
Based on the foregoing, we conclude it was proper not only to convict Defendant of both Rape and Sexual Battery, but also for the trial court to impose separate sentences on these convictions. In other words, Sexual Battery is not a lesser included offense of Rape.
Affirmed.
HOFFMAN, P.J., concurs.
MILLER, P.J., dissents with opinion.